AUDREY STRAUSS
United States Attorney for the
Southern District of New York
By:     JESSICA JEAN HU
Assistant United States Attorney
86 Chambers Street
New York, New York 10007
Tel.:    (212) 637-2726
Fax:    (212) 637-2717
Email: jessica.hu@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br><br>                 v.<br><br>NAUGHTON ENERGY CORPORATION, MARIETTE NAUGHTON, and JOSEPH NAUGHTON,<br><br>                          Defendants. | **COMPLAINT**<br><br>21 Civ. 4782 (_____) |

The United States of America (the "Government"), by its attorney, Audrey Strauss,

United States Attorney for the Southern District of New York, alleges as follows:

## PRELIMINARY STATEMENT

1.      The United States Department of Transportation ("DOT") provides billions of

dollars every year to build and maintain the nation's highways, bridges, and public transportation

systems. As a condition of funding, DOT requires federal grantees to provide opportunities for

Disadvantaged Business Enterprises ("DBEs"), businesses owned by individuals from

communities that historically have been socially and economically disadvantaged, such as

women and racial minorities, to participate in DOT-funded public construction projects.

2.      The New NY Bridge Project (the "NNYB Project") is a DOT-funded construction

project to replace New York's Governor Malcolm Wilson Tappan Zee bridge with a new state-

of-the-art suspension bridge. As a condition of receiving federal funding, the DOT required the NNYB Project to provide DBEs with participation opportunities. In order to meet its DBE participation goal, the prime contractor for the NNYB Project, Tappan Zee Constructors, LLC ("TZC"), hired Naughton Energy Corporation ("Naughton Energy"), a Pennsylvania corporation and certified DBE, to supply diesel fuel to vehicles and equipment working on the NNYB Project. Naughton Energy is operated by, among others, Mariette Naughton, President and majority shareholder of Naughton Energy, and Joseph Naughton, Marketing Manager for Naughton Energy and husband of Mariette Naughton, (collectively with Naughton Energy, "Defendants").

3.     However, Naughton Energy did not provide the services they agreed to perform. Instead, from on or about August 2013 through at least January 2020, Defendants violated the False Claims Act (the "FCA"), 31 U.S.C. §§ 3729-3733, by repeatedly misrepresenting that Naughton Energy had performed its work without the assistance of any other firms. In reality, however, Defendants relied upon a non-DBE to provide the equipment and union labor necessary to deliver fuel to the bridge. Moreover, Defendants actively took steps to obfuscate the role of the non-DBE and, in response to direct inquiries, expressly denied the involvement of a non-DBE.

4.     In reliance on Defendants' false statements, TZC sought DBE participation credit for work that it believed was performed by Naughton Energy but, in fact, was performed by a non-DBE. Defendants' false statements were material to TZC's own claims for payment and approval, and Defendants' actions caused the submission of false claims to DOT.

5.      The Government seeks in this action to recover treble damages sustained by, and civil penalties owed to, the Government on account of Defendants' conduct, as well as to recover damages under the common law theories of payment by mistake of fact and unjust enrichment.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the claims brought under the FCA pursuant to 31 U.S.C. § 3730(a), and 28 U.S.C. §§ 1331 and 1345, over the remaining claims pursuant to 28 U.S.C. § 1345, and over all claims pursuant to the Court's general equitable jurisdiction.

7.      This Court may exercise personal jurisdiction over Defendants, and venue is proper in this district under 31 U.S.C. § 3732(a), and 28 U.S.C. § 1391(b), because Defendants conduct business within this District, and a substantial part of the events giving rise to this Complaint occurred within this District.

## PARTIES

8.      Plaintiff is the United States.

9.      Naughton Energy is a Pennsylvania fuel distributor doing business in and around New York, New York, whose principal place of business is located in Pocono Pines, Pennsylvania. Since 2006, Naughton Energy has been certified by the New York City Metropolitan Transportation Authority as a DBE.

10.      Mariette Naughton is the President and majority shareholder of Naughton Energy.

11.      Joseph Naughton is the Marketing Manager for Naughton Energy and the husband of Mariette Naughton.

## REGULATORY BACKGROUND

12.     DOT provides billions of dollars annually to state and local governments for public construction projects. The Federal Highway Administration, an agency within DOT, provides funding for the construction and improvement of highways and bridges.

13.     In 1999, DOT promulgated regulations entitled "Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs." *See* 49 C.F.R. Part 26 (the "DBE Regulations"). These DBE Regulations require construction projects utilizing DOT-financing to incorporate the participation of DBEs into their contracts. By making DBE participation a condition to the receipt of federal funding, the DBE Regulations provide opportunities for DBEs to perform work on federally funded construction projects. *See* 49 C.F.R. § 26.1. The objectives of the DBE Regulations are to "create a level playing field on which DBEs can compete fairly for DOT-assisted contracts"; to "ensure that only firms that fully meet [the DBE Regulations'] eligibility standards are permitted to participate as DBEs"; and to "promote the use of DBEs in all types of federally-assisted contracts and procurement activities conducted by recipients." *See id.* The DBE Regulations further provide for assistance in the development of DBEs, so they can ultimately compete successfully in the marketplace outside the DBE program. *See, e.g., id.* §§ 26.35-26.39 (providing procedures for DBE business development and mentorship).

14.     The DBE Regulations define a DBE as "a for-profit small business concern—(1) [t]hat is at least 51 percent owned by one or more individuals who are both socially and economically disadvantaged or, in the case of a corporation, in which 51 percent of the stock is owned by one or more such individuals; and (2) [w]hose management and daily business

4

operations are controlled by one or more of the socially and economically disadvantaged individuals who own it." 49 C.F.R. § 26.5.

15.     For contracts utilizing DOT funding, prime contractors are expected to subcontract a percentage of the total contract value to DBEs. DOT has set 10% as the proposed goal for DBE participation for contracts generally. *See id.* § 26.45.

16.     State and local governments who receive DOT funding are only allowed to award contracts to bidders who have made "good faith efforts" to meet the established DBE contract goal. *See id.* § 26.53(a). Accordingly, once a state or local government sets a goal for DBE participation in a DOT-funded public construction project, the contract may only be awarded to a bidder who makes good-faith efforts to meet the DBE participation goal. *See id*. As part of the required good-faith efforts, prime contractors must submit a list of DBEs that will participate in the contract, a description of the work each DBE will perform, the dollar amount of the participation of each DBE, and a written commitment to use the listed DBEs. *Id.* § 26.53(b)(2)(i)-(iv).

17.     Payments made by a contractor to a DBE can count toward the DBE participation goal only if the DBE is performing a "commercially useful function" on the project. *Id*. § 26.55(c). A DBE performs a commercially useful function when it is "responsible for execution of the work on the contract and is carrying out its responsibilities by actually performing, managing, and supervising the work involved." *Id.* § 26.55(c)(1). The DBE must also be responsible for "negotiating price, determining quality and quantity, ordering the material [used for the project], and installing (where applicable) and paying for the material itself." *Id.*

18.     Only the value of the work actually performed by the DBE, with its own work forces, counts toward the DBE goal. *Id.* § 26.55(a). A DBE may not function as a "pass-through"

for another contractor in order to meet a DBE goal. *Id.* § 26.55(a)(2). "A DBE does not perform

a commercially useful function if its role is limited to that of an extra participant in a transaction,

contract, or project through which funds are passed in order to obtain the appearance of DBE

participation." *Id.*

19.     Insofar as the DBE performs commercially useful functions, the DBE Regulations

also govern the degree to which payments to the DBE can be counted towards the DBE

participation goal. *See id.* § 26.55. Further, pursuant to the DBE Regulations, the percentage of

payments made to a DBE that count towards the DBE participation goal varies depending on the

degree of the DBE's involvement and the nature of services provided by the DBE itself. *See* 49

C.F.R. § 26.55.

20.     As relevant to the allegations of this complaint, the DBE Regulations categorize

DBEs that are contracted with for procurement of supplies and material, such as diesel fuel, into

three categories: (a) DBE Manufacturer, (b) DBE Regular Dealer, and (c) DBE

Brokers/Expediters. *Id.* at § 26.55(e).

21.     DBE Manufacturers are those firms which operate or maintain a factory that

produces the materials, supplies, articles, or equipment required under the contract—the DBE

Regulations permit contractors to count 100% of their expenditures paid to DBE Manufacturers

for DBE credit. *Id.* § 26.55(e)(1).

22.     If a DBE firm is not itself a manufacturer, but still plays a central role in

distributing the materials under contract, it may be considered a DBE Regular Dealer. To qualify

as a DBE Regular Dealer, however, the DBE must both own and operate the equipment used.

23.     With respect to DBE Regular Dealers for diesel fuel, a DBE Regular Dealer must:

(a) own, operate, or maintain a store, warehouse, or other establishment in which the diesel fuel

is bought, kept in stock, regularly sold, or leased to the public, *id.* § 26.55(e)(2)(ii); or (b) own and operate distribution equipment for the diesel fuel, *id.* 26.55(e)(2)(ii)(B).

24.     Insofar as a DBE qualifies as a DBE Regular Dealer because it owns and operates the distribution equipment, to the extent it utilizes another entity's equipment, the DBE Regulations require that the arrangement must be through a long-term lease and not on an ad hoc or contract-by-contract basis. *Id.*

25.     The DBE Regulations permit that 60% of payments paid to a DBE Regular Dealer can be counted towards the DBE participation goal for the project. *See id.* § 26.55(e)(2)(i).

26.     Where materials or supplies, such as diesel fuel, are purchased from a DBE that fails to meet the requirements of either a DBE Manufacturer or a DBE Regular Dealer, the DBE Regulations prohibit the cost of the materials and supplies purchased from the DBE from being counted toward the DBE participation goal. *Id.* § 26.55(e)(3).

27.     In such circumstances, the DBE should instead be attributed DBE credit consistent with the DBE Regulations' DBE Broker/Expediter category. For DBE Broker/Expediters for diesel fuel, only the fees, commissions, or transportation charges associated with the delivery of diesel fuel can be counted towards the DBE goal, not the cost of the fuel itself. *Id.*

28.     Every DOT-funded public construction project contract must include an assurance that "[t]he contractor shall carry out applicable requirements of [the DBE Regulations] in the award and administration of DOT-assisted contracts." 49 C.F.R. § 26.13(b). Every contract must also provide that "[f]ailure . . . to carry out [the DBE Regulation] requirements is a material breach of this contract, which may result in the termination of this contract or such other remedy as the recipient deems appropriate." *Id.*

## FACTUAL ALLEGATIONS

**I.      The NNYB Project and Tappan Zee Constructors, LLC**

29.      On or about March 9, 2012, the New York State Thruway Authority ("NYSTA")
and the New York State Department of Transportation ("NY-DOT") issued a request for
proposals for a multi-billion dollar contract for the design and construction of a new state-of-the-
art twin-span bridge to replace the old Governor Malcolm Wilson Tappan Zee bridge.

30.      On or about July 27, 2012, NYSTA and NY-DOT received three proposals in
response to their request. Following a review of the proposals, NYSTA and NY-DOT awarded
the contract for the NNYB Project to TZC – a limited liability company formed for the purpose
of bidding on and constructing the NNYB Project.

**II.     The DBE Requirements for the NNYB Project**

31.      As required by the DBE Regulations, Article 16 of the Design Build Contract
between NYSTA, NY-DOT, and TZC (the "NNYB Contract"), committed TZC to an overall
DBE participation goal for the NNYB Project of 10% of the contract price for the project.
Furthermore, Appendix IV of the NNYB Contract expressly stated that the DBE Regulations
applied to the contract and that the contract adopted the DBE Regulations.

32.      In addition, Section DB 102-8 of the NNYB Contract spoke to DBE utilization on
the NNYB Project. Specifically, Section DB102-8.4 states that "[t]he value of the Work
performed by a DBE . . . with its own equipment, its own forces, and under its own supervision
will be counted toward the goal, provided the utilization is a commercially useful function."

33.      Section DB102-8.5 of the NNYB Contract states further that "[a] DBE is
considered to perform a commercially useful function when it is responsible for the execution of
a distinct element of work on a contract and carries out its responsibilities by actually

performing, managing, and supervising the work involved in accordance with normal industry practice." The contract goes on to state that, "[r]egardless of whether an arrangement between the Design-Builder and the DBE represents standard industry practice, if the arrangement erodes the ownership, control or independence of the DBE or in any other way does not meet the commercially useful function requirement, that firm shall not be included in determining whether the DBE goal is met and shall not be included in DBE reports."

34.     Section 102.8-5 further specifies that "[a] DBE does not perform a commercially useful function if its role is limited to that of an extra participant in a transaction or contract through which funds are passed in order to obtain the appearance of DBE participation."

35.     The NNYB Contract incorporated the requirements of the DBE Regulations and, therefore, prohibited TZC from claiming DBE participation credit in a manner inconsistent with the DBE Regulations.

36.     Since 2006, Naughton Energy has been certified as a DBE by the New York City Metropolitan Transportation Authority and Defendants are familiar with the DBE regulations. Accordingly Defendants were aware that, pursuant to the DBE Regulations, a DBE must utilize its own equipment and workforce to perform a commercially useful function. Defendants further understood that the involvement of a non-DBE subcontractor in the work TZC wholly attributed to Naughton Energy could negatively impact the amount of DBE participation credit TZC could claim.

## III.     TZC Seeks a DBE to Provide Fuel Services to the NNYB Project

37.     In order to satisfy the DBE participation goal imposed by the NNYB Contract, prior to beginning construction, TZC sought to identify DBE subcontractors who could provide various services on the NNYB Project. As most relevant to this Complaint, TZC specifically

sought to identify a DBE subcontractor who could provide fuel services to the NNYB Project. Fuel services involved delivering different types of fuel, specifically diesel fuel and gasoline, to the heavy equipment and machinery performing construction on the bridge.

38.     Given the NNYB Project's high fuel demands, as well as the distance between the bridge and the nearest fuel terminals in the Bronx, a fuel supplier would need a fuel delivery vehicle with a high tank capacity, so as to avoid the need for multiple round trips between the bridge and the fuel terminal.

39.     In addition, NNYB Contract's required TZC to utilize fuel delivery subcontractors affiliated with Union X, the labor union associated with the NNYB Project for the majority of work performed on the bridge. Because Union X would prevent employees of non-Union affiliated employers from entering the work site, TZC required subcontractors providing fuel services to maintain Union X affiliation.

40.     In addition to seeking a DBE fuel supplier that had a vehicle with sufficient tank capacity and was affiliated with Union X, TZC also sought a DBE that would qualify as either as a DBE Manufacturer or a DBE Regular Dealer, which would allow TZC to earn greater DBE credit than if it only hired a DBE Broker/Expediter.[1]

---

[1] The cost of the materials purchased from DBE Brokers/Expediters cannot be counted towards a DBE participation goal. *See* 49 C.F.R. § 26.55(e)(3). In the case of fuel, the cost of the fuel itself constitutes the bulk of the total amount paid for fuel services. Accordingly, a fuel services provider that qualified for DBE credit as either a DBE Manufacturer or a DBE Regular Dealer would provide TZC with significantly more DBE credits than a fuel supplier that only qualified for credit as a DBE Broker/Expediter.

**IV.    Defendants Partnered With a Non-DBE and Took Steps to Hide Their Arrangement in Order to Receive Millions of Dollars in Federal Funds**

*A.    Defendants Represented That They Could Provide Services on the NNYB Project Without Outside Assistance*

41.    In 2013, after the NNYB Project had been awarded to TZC, an employee of one of the member companies of TZC ("Employee-1") asked Joseph Naughton if Naughton Energy had DBE status and whether it would be able to supply fuel to the NNYB Project. Joseph Naughton responded that Naughton Energy was a DBE and that TZC would receive DBE credit for the work performed by Naughton Energy. Joseph Naughton further stated to Employee-1 that Naughton Energy itself would perform all the deliveries for the project and could supply a union driver who would meet TZC's requirements for the job.

42.    However, when Joseph Naughton made these representations to Employee-1, he failed to disclose that Naughton Energy had neither a fuel delivery truck with sufficient capacity to effectively provide fuel to the NNYB Project, nor the Union X affiliation necessary to meet TZC's requirements. Accordingly, without outside assistance and support, Naughton Energy was unprepared to serve as the fuel supplier for the NNYB Project.

43.    Following this conversation, TZC arranged for an in-person meeting with Naughton Energy. Employee-1, along with three other representatives from TZC, attended the meeting, as did Joseph Naughton, Mariette Naughton, and two other Naughton Energy employees. During the meeting, Employee-1 informed Joseph and Mariette Naughton that because TZC wanted to claim DBE credit for the fuel supply services, Naughton Energy needed to have DBE status to work on the project. In response, Naughton Energy falsely stated again that: (a) Naughton Energy had the ability to perform all the fuel delivery services needed for the NNYB Project; and (b) Naughton energy had a driver that would satisfy the union requirements

11

for the job. At no point did Naughton Energy disclose that Naughton Energy intended to partner with a non-DBE company in order to satisfy TZC's requirements.

44.     Had Naughton Energy reported that it would be working with a non-DBE to fulfill its obligations, it would have jeopardized the amount of DBE credit TZC could seek for Naughton Energy's services. Accordingly, TZC would have taken further steps to inquire into Naughton Energy's status as a DBE Regular Dealer for fuel services. These steps could have led TZC to decline to hire Naughton Energy in favor of a competing fuel service provider.

45.     Indeed, had Defendants disclosed an intention to partner with a non-DBE to provide services, Employee-1 would have viewed this as a negative, as Employee-1 believed that the involvement of a non-DBE subcontractor would affect the Commercially Useful Function requirements for a DBE supplier. Employee-1's understanding was instead that Naughton Energy would be performing all of the contracted work on its own.

### B.  Defendants' False Statements on the TZC DBE Questionnaire About Subcontractor Involvement in Their Services

46.     Prior to beginning work on the NNYB Project in August of 2013, Defendants also submitted to TZC a "Subcontractor/Supplier Questionnaire" (the "TZC DBE Questionnaire") in which they falsely stated that Naughton Energy would not use subcontractors to complete any part of Naughton Energy's work for TZC. Naughton Energy made these misleading statements on the TZC DBE Questionnaire knowing that TZC would, and ultimately did, rely on these misrepresentations when deciding to whom to award the fuel services contract.

47.     More specifically, in response to a question on the TZC DBE Questionnaire as to whether Naughton Energy would "[s]ubcontract part of work to others," Naughton Energy selected "No." With respect to the involvement of subcontractors specifically, in the space

provided on the TZC DBE Questionnaire to describe "[w]hich type of work, if any, does the organization intend to subcontract to others," Naughton Energy listed "N/A."

48.     Further, in response to a question on the TZC DBE Questionnaire as to whether the work would be performed by Naughton Energy's own manpower, Naughton Energy stated "Yes." Relatedly, in response to a question asking Naughton Energy to "[l]ist any and all union affiliations your company has within the project jurisdiction," Naughton Energy wrote "[Union X] – Tarrytown/West Chester Union." However, these statements were all false. Naughton Energy lacked any affiliation with Union X, the union representing organized labor for the NNYB Project, and, therefore, was unable to perform the work for the NNYB Project using its own employees.

49.     Lastly, in response to the TZC DBE Questionnaire's question which asked whether the respondent owned major equipment to be used for the proposed construction work, Naughton Energy responded "yes," and described that equipment as "Fuel Truck for fuel deliveries." Defendants' response misrepresented Naughton Energy's capacity to perform the NNYB Project with its own equipment.

50.     Although Naughton Energy did maintain its own fleet of fuel delivery trucks at the time it completed the TZC DBE Questionnaire, its trucks had a maximum capacity of about 2,800 gallons of fuel. TZC initially estimated that the NNYB Project would require 3 million gallons of diesel fuel. This fuel demand, coupled with the distance between the bridge and the refueling stations in the Bronx, meant that it would be nearly impossible for Naughton Energy to meet its obligations on the NNYB Project without a larger capacity truck. More specifically, in the absence of a larger truck, Naughton Energy would have been forced to make multiple time-

consuming trips to refuel its vehicles. Given the distance involved and high fuel demand, such a

prospect would have made the project unfeasible.

### C.  Defendants Relied on Subcontractor Y, a Non-DBE, to Provide Fuel Delivery Services on the NNYB Project

51.     Knowing its own equipment and labor limitations, Naughton Energy needed to

partner with another company in order to satisfy TZC's requirements. To that end, in or about the

summer of 2013, Naughton Energy asked Subcontractor Y, a non-DBE fuel delivery company

owned entirely by John Doe and his sister, Jane Doe, to assist in providing diesel fuel to the

NNYB Project. Unlike Naughton Energy, Subcontractor Y had both the Union X affiliation and

a larger capacity fuel delivery truck necessary to fulfill the project requirements.

52.     More specifically, Subcontractor Y owned a fuel delivery truck, which held

approximately 4,400 gallons of fuel (the "Project Truck"), as compared with Naughton Energy's

trucks which held only approximately 2,800 gallons of fuel. The Project Truck was also

equipped with the Fleet Navigator bar code system, which monitors and records the amount of

fuel dispensed. By tracking every gallon of fuel dispensed, the Fleet Navigator allows for the

creation of monthly reports, which can be used to verify monthly billings. It would be impossible

to effectively track and bill for the fuel dispensed on the NNYB Project without such a system.

53.     In order to enlist Subcontractor Y's assistance, Naughton Energy proposed the

following arrangement to John Doe. Naughton Energy would manage the administrative

logistics, including, purchasing, billing, scheduling, and serving as the sole point of contact with

TZC. John Doe would provide union-affiliated employees who would conduct the actual

deliveries to the NNYB Project worksite using the Project Truck. Naughton Energy represented

to TZC, however, that all of the work performed by Subcontractor Y's employees were instead

performed by Naughton Energy.

54.     In exchange for Subcontractor Y's services, Naughton Energy would pay them forty-four cents ($0.44) on each gallon of fuel sold to TZC. This amount constituted half of Naughton Energy's profits on each gallon sold to TZC and reflected Subcontractor Y's true status as an equal partner in the work performed for TZC .

55.     Notwithstanding their arrangement to equally divide the profits associated with the NNYB Project, Naughton Energy and Subcontractor Y took steps to conceal their arrangement from TZC and create the appearance that Naughton Energy provided services for the NNYB Project without the assistance of Subcontractor Y.

56.     Specifically, in order give the appearance that Naughton Energy owned the Project Truck, Subcontractor Y agreed to transfer the title and registration of the Project Truck to Naughton Energy for a single dollar ($1). The Project Truck, however, was worth substantially more than one dollar. In fact, the Fleet Navigator system alone had a market-value of over $10,000 and Subcontractor Y paid between $5,000 to $7,000 just to install the system.

57.     Naughton Energy and Subcontractor Y also agreed that part of Subcontractor Y's compensation for its services would be provided in the form of a salary paid directly to John Doe. The salary arrangement enabled Naughton Energy to report to TZC that Joe Doe was Naughton Energy's employee and, therefore, that Naughton Energy employees were actually performing the work on the NNYB Project, further hiding Subcontractor Y's involvement.

58.     In reality, John Doe functioned independently from Naughton Energy's supervision and control throughout his tenure on the project. In addition to delivering diesel fuel to the NNYB Project, he continued to use the Project Truck, which was purportedly owned by Naughton Energy, to make fuel deliveries for Subcontractor Y's customers. At no time did Defendants prohibit John Doe from using the Project Truck for these deliveries. In fact,

15

throughout the project, John Doe remained at liberty to use the Project Truck to make deliveries for Subcontractor Y without obtaining any prior approval or authorization from Naughton Energy.

### D. Subcontractor Y Performed a Substantial Portion of Naughton Energy's Work on the NNYB Project

59.     Beginning in or about August 2013, Naughton Energy purportedly began delivering diesel fuel for the NNYB Project. However, Subcontractor Y was actually performing many of the services that were supposed to be performed by Naughton Energy.

60.     At the outset of the project, the fuel deliveries were performed by John Doe and a Naughton Energy employee. The Naughton Energy employee would drive the Project Truck to transport fuel from the fueling stations in the Bronx to Subcontractor Y's parking location for the Project Truck. This parking location was arranged and paid for by Subcontractor Y.

61.     John Doe would then drive the fuel-filled truck to the NNYB Project job site. The Naughton Energy employee was unable to deliver fuel to the job site himself because he was not a member of Union X.

62.     Beginning in the spring of 2015, TZC's need for diesel fuel on the NNYB Project jumped from approximately 17,000 gallons per week to approximately 35,000 gallons per week. Due to the substantial increase, John Doe brought on another Subcontractor Y employee, Driver-2, to assist with fuel deliveries for the NNYB Project. Like John Doe, Driver-2 was affiliated with Union X and could deliver fuel to the NNYB Project work site. Unlike John Doe, however, Driver-2 was never added to Naughton Energy's payroll.

63.     In keeping with the fact that Subcontractor Y and not Naughton Energy employed Driver-2 and John Doe, Subcontractor Y reported to Union X that it employed these individuals. Furthermore, consistent with its role as the true employer of John Doe and Driver-2,

16

Subcontractor Y paid Union X all of the benefits associated with the hours that they worked delivering diesel fuel to the NNYB Project.

64.     Moreover, consistent with Driver-2 being an employee of Subcontractor Y (and not Naughton Energy), Driver-2 took direction solely from John Doe and continued to use the Project Truck to deliver fuel to Subcontractor Y's customers while also delivering fuel to the NNYB Project. Defendants never told John Doe that there was any problem with Driver-2 performing work on the NNYB Project.

65.     At the start of the NNYB Project, John Doe also used the Project Truck to make deliveries on behalf of Subcontractor Y's residential customers. John Doe did not seek any authorization from Naughton Energy to do this, because Naughton Energy understood that John Doe could continue to use the Project truck for Subcontractor Y purposes.

66.     In the event that Subcontractor Y delivered fuel to one of its customers that was actually purchased by Naughton Energy or, conversely, if Subcontractor Y delivered fuel to the NNYB Project that it, and not Naughton Energy, purchased, John Doe would note the balance owed. Subcontractor Y and Naughton Energy would then repay one another by purchasing or using additional fuel.

### E. Defendants Repeatedly Denied Subcontractor Y's Involvement in Naughton Energy's Diesel Fuel Deliveries for the NNYB Project

   a. Mariette Naughton Denied Using a Non-DBE Subcontractor During a November 2014 DBE Compliance Review

67.     In November 2014, a DBE compliance review agent hired by TZC conducted an on-site visit of the administrative offices of Naughton Energy. During that visit, the agent met with Mariette Naughton and specifically inquired into who performed the work for the NNYB Project.

68.     Notwithstanding that Mariette Naughton understood the purpose of the review was to determine the level of DBE participation credit that could be properly attributed to Naughton Energy, she failed to disclose during the interview: (a) John Doe's affiliation with Subcontractor Y; and (b) Subcontractor Y's involvement in the services provided by Naughton Energy for the NNYB Project. Indeed, on the DBE checklist associated with the visit, the DBE compliance review agent checked "Y[es]," in response to the question "[i]s the DBE working without the assistance of other firms?"

      b.   <u>Defendants Intentionally Misrepresented Subcontractor Y's Involvement in Response to TZC's Direct Inquiries Regarding Subcontractor Involvement in Naughton Energy's Deliveries</u>

69.     After Naughton Energy began providing diesel fuel deliveries for the NNYB Project, TZC requested that Naughton Energy also provide gasoline delivery.[2] Consistent with TZC's understanding that Naughton Energy was a DBE supplier of fuel services, TZC sought DBE credit for both Naughton Energy's diesel fuel deliveries and gasoline deliveries.

70.     In April 2015, however, NYSTA contacted TZC's DBE Program Manager to advise that Naughton Energy appeared to be utilizing a non-DBE subcontractor to make gasoline deliveries to the NNYB Project. NYSTA advised that the participation of this subcontractor in Naughton Energy's work conflicted with TZC claiming 60% participation credit for payments made to Naughton Energy.

71.     In response to this inquiry from NYSTA, on April 29, 2015, TZC's DBE Program Manager sent an e-mail to Mariette Naughton stating that "[w]e are hearing that fuel purchased

---

[2] While also a form of fuel, gasoline is lighter in consistency than diesel fuel. Although gasoline engines can deliver higher performance than diesel engines, diesel fuel typically provide more power and mileage per gallon than gasoline. Most heavy construction equipment relies on diesel fuel.

by TZC from Naughton is being delivered by a third party. We need to discuss this relative to DBE Program requirements."

72.      A Vice President at Naughton Energy responded by e-mail to TZC's DBE Program Manager on April 30, 2015, stating that the gasoline deliveries "should not be part of the DBE program as our fuel truck is not equipped to deliver gasoline, so we subcontracted this out to a Teamster Certified Union company. This was all agreed upon with the TPZ [sic] Buyer."

73.      While this e-mail from Naughton Energy acknowledged the involvement of a non-DBE subcontractor in the delivery of *gasoline* to the NNYB Project (for which Naughton Energy had been paid approximately $60,000), and the impact this would have on the DBE credit associated with Naughton Energy's gasoline deliveries, the e-mail failed to disclose the role of Subcontractor Y in the delivery of *diesel fuel* to the NNYB Project (for which Naughton Energy had been paid over $5,000,000 for its services). In fact, the email explicitly presented the Project Truck as belonging to Naughton Energy.

74.      Specifically, the e-mail attached photos of the Project Truck, as well as the Registration and Title for the Project Truck and stated "[a]attached are the following documentation of our fuel truck that is delivering <u>diesel</u> to the job site at the Tappan Zee Bridge . . . ." (emphasis in original). The e-mail went on to state "[a]s you can see from the pictures, it shows Naughton Energy & our DOT # on the doors." The e-mail made no mention of Subcontractor Y, Subcontractor Y's transfer of the Project Truck for a mere dollar, the involvement of Subcontractor Y's personnel in delivering diesel fuel to the NNYB Project, nor of Naughton Energy's agreement to share half its profits with Subcontractor Y.

75.      TZC's DBE Program Manager responded to Naughton Energy's e-mail on May 4, 2015, and asked what markings were on the Project Truck's tank, as the pictures sent only

showed the cab of the truck. In response to this e-mail, on May 4, 2015, Naughton Energy's COO sent an e-mail stating that "This is the truck on site daily we own and is registered and insured under Naughton Energy Corp. The sides of the tank read [Subcontractor Y]. We did not repaint because the down time and additional cost associated."

76.     Naughton Energy plainly understood that TZC's DBE Program Manager's questions about the Project Truck were to ascertain whether there was a subcontractor involved in the diesel fuel deliveries because, as Naughton Energy had acknowledged with respect to its gasoline deliveries, such participation would directly impact the amount of DBE participation credit that TZC would seek for Naughton Energy's services. Nevertheless, Naughton Energy intentionally failed to disclose any information regarding Subcontractor Y's true involvement.

77.     On May 15, 2015, after the Project Truck continued to have markings consistent with it being owned by Subcontractor Y, TZC inquired again as to why the Project Truck bore markings inconsistent with its ostensible ownership by Naughton Energy. In response to these inquiries, Joseph Naughton wrote: "[w]e purchased the truck from [Subcontractor Y]. The tank was suppose [sic] to be painted, but it is being used on almost a full time basis at the bridge. We recently indicated to our driver the need to schedule a time to get the tank painted. I discussed this matter with him this morning and indicated the need to get the tank painted ASAP. He is in the process of scheduling a time with our painting contractor."

78.     Even though Joseph Naughton understood that TZC's inquiries regarding the Project Truck's markings stemmed from concerns relating to Naughton Energy's DBE status, Joseph Naughton's response failed to disclose that: (a) the truck had been purchased in a sham transaction as part of a larger partnership arrangement with Subcontractor Y; (b) the driver of the

truck was in fact the co-owner and operational head of Subcontractor Y; and (c) Naughton Energy was sharing half of its profits from the diesel fuel deliveries with Subcontractor Y.

79.     Following their May exchange with Naughton Energy regarding the involvement of subcontractors in the gasoline and diesel fuel deliveries provided to TZC by Naughton Energy, TZC stopped seeking any DBE participation credit for Naughton Energy's gasoline deliveries, but *continued* to seek DBE participation credit for 60% of the total payments made to Naughton Energy for diesel fuel deliveries.

80.     In a subsequent e-mail from June 18, 2015, after TZC's DBE Program Manager again inquired as to why the Project Truck remained unpainted, Joseph Naughton responded: "Naughton Energy purchased the fuel truck used for Tappan Zee fueling requirements from [Subcontractor Y] with the agreement the truck would be based at their Bronx facility . . . . the truck is owned by Naughton Energy, the fuel is a Naughton Energy product, and the driver is employed by Naughton Energy."

81.     In the face of TZC's DBE Program Manager's repeated inquiries to determine whether Subcontractor Y had any ongoing involvement with Naughton Energy's diesel fuel deliveries, Joseph Naughton represented that: (a) the Project Truck was owned by Naughton Energy; and (b) the fuel deliveries were performed by Naughton Energy employees.

82.     In November 2015, TZC conducted another DBE compliance review of Naughton Energy. Mariette Naughton was the Naughton Energy contact for that review. However, in spite of Naughton Energy's awareness that TZC had concerns regarding the role a non-DBE subcontractor played in their fuel deliveries, Naughton Energy again failed to disclose Subcontractor Y's involvement as part of their DBE compliance review.

83.     In reliance on Naughton Energy's representations and failure to disclose

Subcontractor Y's role in delivering diesel fuel to the project site, TZC gave DBE credit to

Naughton Energy consistent with it not utilizing a non-DBE subcontractor.

**V.      Defendants False Statements and Records Regarding Subcontractor Y's Role Were Material to TZC'S Claims for Federal Funding on the NNYB Project**

84.     From on or about July 2012 through at least January 2020, TZC submitted to

NYSTA hundreds of claims for DBE credit relating to over twenty million dollars in payments to

Naughton Energy. These claims were submitted through NY-DOT's web-based civil rights

reporting system Equitable Business Opportunities ("EBO").

85.     Under the terms of the NNYB Contract, TZC was required to enter DBE

utilization on a monthly basis. In addition, TZC was required to explain, in writing, the "scope of

the work to be performed by the DBE and expressly indicate any item or component of the scope

which is not completely performed by the DBE."

86.     Each of these EBO submissions sought DBE credit for 60% of payments made to

Naughton Energy, a percentage consistent with Naughton Energy having provided the fuel

services with its own equipment and personnel as a DBE Regular Dealer.

87.     In addition, TZC submitted to NY-DOT and NYSTA DBE Quarterly Reports that

falsely represented that Naughton Energy provided diesel fuel services, without the assistance of

a non-DBE subcontractor.

**VI.     Defendants' Fraudulent Conduct Was Material to the United States' Payments for the NNYB Project**

88.     Compliance with the DBE Regulations was material to the payments made by the

United States for the NNYB Project. Compliance with the DBE Regulations' requirements and

DBE-related contractual requirements—including those concerning the DBE's performance of a

commercially useful function by executing the DBE work with its own workforces, and supervising and managing its own work—were conditions to obtaining the NNYB contracts and of receiving payment for work under those contracts.

89.     To ensure compliance with the DBE Regulations on projects financed by DOT, the Government has actively enforced the regulations through administrative and judicial actions. Specifically, the Government, through DOT and its components, has repeatedly suspended or debarred contractors, vendors, and their owners for violating the DBE Regulations. In addition, the Government has actively pursued the recovery of contract payments for DOT funded projects that were subject to DBE fraud through civil and criminal actions, including in a number of actions in this District.

90.     The Government's administrative and enforcement actions evidence that compliance with the DBE Regulations is material to the Government's decisions to fund public construction projects throughout the country.

91.     Here, compliance with the DBE Regulations was material to the payments made by the United States for the NNYB Project. Compliance with the DBE Regulations' requirements and DBE-related contractual requirements—including those concerning the DBE's performance of a commercially useful function by executing the DBE work with its own workforces, and supervising and managing its own work—were conditions to obtaining the NNYB Project contract and of receiving payment for work under those.

92.     NY-DOT and NYSTA relied on TZC's submissions on EBO, as well as its DBE Quarterly Reports, to determine the value of Naughton Energy's contribution to the NNYB Project's DBE Participation goal. Likewise, these statements, records, and claims by TZC then

informed NY-DOT and NYSTA's assessment of whether TZC was meeting the DBE
participation goal for the NNYB Project.

93.     Accordingly, as a direct result of presenting or causing to be presented false
claims and making or causing to be made false statements and records concerning Naughton
Energy and Subcontractor Y's actual roles on the NNYB Project, Defendants received federal
funds to which they were not entitled.

## CLAIM FOR RELIEF

### COUNT ONE: FALSE CLAIMS ACT
### Violations of the False Claims Act: Presentation of False Claims

94.     The United States repeats and realleges the allegations in paragraphs 1 through
93.

95.     The United States asserts claims against Defendants under Section 3729(a)(1)(A)
of the False Claims Act.

96.     In furtherance of their scheme to violate the DBE Regulations and to conceal
these violations by hiding Subcontractor Y's actual role from TZC, NY-DOT, NYSTA, and
DOT, Defendants knowingly presented, or caused to be presented, to TZC, NY-DOT, and
NYSTA, as recipients of federal funds that were spent on the United States' behalf and to
advance the United States' interests, false or fraudulent claims for payment of federal funds,
including, *inter alia*, Monthly DBE Progress Reports, DBE Quarterly reports, and claims
submitted on Equitable Business Opportunities, NY-DOT's web-based civil rights reporting
system.

97.    By reason of these false claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

98.    Accordingly, the United States is entitled to treble the United States' damages, in an amount to be determined at trial, plus civil penalties for each false claim presented and an award of costs pursuant to 31 U.S.C. § 3729(a).

## COUNT TWO: FALSE CLAIMS ACT
**Violations of the False Claims Act: Making or Using a False Record or Statement**

99.    The United States repeats and realleges the allegations in paragraphs 1 through 93.

100.    The United States asserts claims against Defendants under Section 3729(a)(1)(B) of the False Claims Act.

101.    In furtherance of their scheme to violate the DBE Regulations and to conceal these violations by hiding Subcontractor Y's actual role from TZC, NY-DOT, NYSTA, and DOT, Defendants knowingly made or used, or caused to be made or used, false records or statements, including, *inter alia*, misrepresentations as to Subcontractor Y's involvement on the NNYB Project, and the use of Subcontractor Y's labor and equipment in services provided by Naughton Energy on the NNYB Project, that were material to getting false or fraudulent claims paid by NY-DOT and NYSTA, as recipients of federal funds that were spent on the United States' behalf and to advance the United States' interests.

102.    By reason of these false statements or records, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil penalty as required by law for each violation.

25

## COUNT THREE: UNJUST ENRICHMENT

103.     The United States repeats and realleges the allegations in paragraphs 1 through 93.

104.     By reason of the payments to Naughton Energy, Defendants were unjustly enriched. The circumstances of Defendants' receipt of these payments are such that, in equity and good conscience, Defendants should not retain these payments, the amount of which is to be determined at trial.

## COUNT FOUR: PAYMENT UNDER MISTAKE OF FACT

105.     The United States repeats and realleges the allegations in paragraphs 1 through 93.

106.     The United States seeks relief against Defendants to recover monies paid under mistake of fact.

107.     The United States made payments to fund the NNYB Project based on a mistaken and erroneous understanding of a material fact—the fact being that Defendants were complying with DBE Regulations.

108.     The United States is entitled to recover payments it made based on its mistaken belief that Defendants were complying with DBE Regulations.

109.     By reason of the foregoing, the United States was damaged in a substantial amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests that judgment be entered in its favor and against Defendants as follows:

(i)      On Counts 1 and 2 (False Claims Act) against Naughton Energy Corporation, Mariette Naughton, and Joseph Naughton, for treble the United States' damages, in an amount to be determined at trial, plus civil penalties as allowed by law;

(ii)     On Counts 3 and 4, against Naughton Energy Corporation, Mariette Naughton, and Joseph Naughton, for relief in an amount to be determined at trial; and

(iii)    Order such further relief as the Court may deem just and proper.

Dated: New York, New York
       May 28, 2021

AUDREY STRAUSS
United States Attorney for the
Southern District of New York
*Attorney for United States of America*

By:      /s/ *Jessica Jean Hu*
JESSICA JEAN HU
Assistant United States Attorney
86 Chambers St., 3rd Floor
New York, New York 10007
(212) 637-2726 / 2633
jessica.hu@usdoj.gov